CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
August 26, 2025
LAURA A. AUSTIN, CLERK
BY s/ S. MELVIN
   DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

| | |
|---|---|
| CHRISTOPHER H., ) | |
|     Plaintiff, ) | |
| ) | Civil Action No. 3:24cv00070 |
| v. ) | |
| ) | REPORT & RECOMMENDATION |
| FRANK BISIGNANO, ) | |
| Commissioner of Social Security, ) | By:   Joel C. Hoppe |
|     Defendant. ) | United States Magistrate Judge |

Plaintiff Christopher H. asks this Court to review the Commissioner of Social Security's final decision denying his claim for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–434. Compl., ECF No. 1. The case is before me by referral under 28 U.S.C. § 636(b)(1)(B). Having considered the administrative record ("R."), ECF No. 9; the parties' briefs, ECF Nos. 11-1, 14; and the applicable law, I find that the Administrative Law Judge ("ALJ") did not follow the governing regulation when evaluating conflicting medical opinions, 20 C.F.R. § 404.1520c, and that substantial evidence does not support the ALJ's reason for accepting the less-restrictive opinion. *See* R. 37–38 (citing R. 77–78, 86–88). Accordingly, I respectfully recommend the presiding District Judge reverse the Commissioner's final decision and remand the matter under the fourth sentence of 42 U.S.C. § 405(g).

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final decision that a person is not entitled to disability benefits. 42 U.S.C. § 405(g); *see Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it cannot "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, a court

1

reviewing the merits of the Commissioner's final decision asks only whether the ALJ applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings and final decision. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 20 C.F.R. § 404.1505(a).[1] Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, if the claimant (1) is working; (2) has a severe

---

[1] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the written decision subject to judicial review under 42 U.S.C. § 405.

impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can preform other work existing in the economy. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II. Background[2]

Christopher applied for DIB in November 2021. R. 180–81. He alleged that he had been disabled since June 30, 2021, because of numerous impairments including lumbar spondylosis; lumbar radiculopathy; "extreme pain" in his neck, lower back, legs, and feet; muscle spasms; and "residuals from multiple back surgeries" with "limited ability to sit/stand for long periods." R. 72; *see* R. 242–44, 247. Christopher was 49 years old, or "a younger person" under the regulations, on his alleged onset date. R. 72; 20 C.F.R. § 404.1563(c). He became a person "closely approaching advanced age" when he turned 50 years old in October 2021. *See* R. 72; 20 C.F.R. § 404.1563(c). Virginia Disability Determination Services ("DDS") denied his claim initially in August 2022, R. 79, and upon reconsideration in December 2022, R. 89.

William Humphries Jr., M.D., reviewed Christopher's initial record for DDS in August, and Daniel Camden, M.D., reviewed his updated records for DDS in December. *See generally* R. 73–78 (Dr. Humphries); R. 82–88 (Dr. Camden). Drs. Humphries and Camden agreed that

---

[2] Christopher challenges the ALJ's residual functional capacity ("RFC") assessment on two grounds. *See* Pl.'s Br. 9–18 (conflicting DDS medical opinions); *id.* at 18–21 (symptoms). His argument that the ALJ did not follow 20 C.F.R. § 404.1520c when determining the persuasiveness of conflicting DDS medical opinions reveals a clear legal that requires remand. *See id.* at 12–18 (citing R. 37–38, 77–78, 86–88). Accordingly, my summary of the record focuses on the evidence relevant to that issue.

3

Christopher's severe spine disorder(s), R. 75, 84, allowed him to do a range of "light" exertional work insofar as he could frequently lift/carry 10 pounds; occasionally lift/carry up to 20 pounds; and frequently engage in most work-related postural activities, but should avoid some degree of exposure to vibrations and hazards. R. 77–78, 86–88; *see* 20 C.F.R. § 404.1567(b).[3] They gave conflicting medical opinions about Christoper's residual capacities to sit, stand, and walk during an eight-hour workday. *Compare* R. 77 (sit and stand/walk "for a total of[] about 6 hours [each] in an 8 hour workday"), *with* R. 86 (stand/walk "for a total of[] 4 hours" and sit "for a total of[] about 6 hours in an 8 hour workday," but "must periodically alternate sitting and standing to relieve pain and discomfort").

    Dr. Humphries opined that Christopher could sit for "about 6 hours," and stand/walk for "about 6 hours," during an eight-hour workday. R. 77. He based all of Christoper's exertional limitations on then-available medical evidence showing "the clmt has a hx of back pain. He has reduced ROM in neck, shoulders abduction, and T/L spine. He [h]as positive SLR too." *Id.* Dr. Humphries repeated this rationale in explaining why Christopher had some postural limitations and should "avoid concentrated exposure" to vibrations and workplace hazards. *See* R. 77–78. Christopher did not have any manipulative limitations. R. 77. Dr. Humphries then provided the following "additional explanation" for his proposed RFC finding as a whole:

> The clmt has a hx of severe lower back pain and leg pain and catherization [sic] with stent placement. Records report that the clmt has responded well to radiofrequency ablation, intermittent epidural steroid injections were well as [sic] spinal cord stimulator for somatic and neuropathic pain. Recent physical CE in

---

[3] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b). "[T]he full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday. Sitting may occur intermittently during the remaining time," SSR 83-10, 1983 WL 31251, at *6 (Jan. 1, 1986); *see Bilotta v. Saul*, 850 F. App'x 162, 164 n.5 (4th Cir. 2021); *Belanger v. Comm'r of Soc. Sec.*, 620 F. Supp. 3d 416, 423–24 (W.D.N.C. 2022).

4

> 7/2022 reported positive Romberg sign, reduced ROM in cervical neck joint, reduced shoulder abduction, reduced flexion/extension of T/L spine, and positive SLR sitting and standing. However, the clmt has normal gait and walks without an AD, normal muscle strength (5/5), normal reflexes, normal sensation to light touch. Clmt's grip strength and pinch strength were normal and his abilities in performing gross and fine functions were normal. There were no limitations in his dominant hand. Clmt uses CPAP machine daily for his sleeping problems. Clmt drives his own vehicle and shops i[n] stores per ADLs.

R. 78; *see* R. 74–75.

When Dr. Camden reviewed Christopher's updated medical records in December 2022, he opined that Christopher could stand/walk for only "4 hours" and could sit for "about 6 hours in an 8 hour workday," but "must periodically alternate sitting and standing to relieve pain and discomfort." R. 86; *see also* R. 87–88. He suggested a "positional change after sitting 2 hours for 15–30 min." R. 86. Dr. Camden based his proposed exertional limitations on evidence showing:

> Remote history of LS fusion L3-S1. Post-laminectomy syndrome with reports of chronic axial low back pain. Currently with opioid pain mgmt and SCS with report of benefit. Not using Ad and exams with no objective weakness, has decreased sensory right S1 and +SLR sitting RLE at 45degrees. Gaits vary from normal to antalgic. Suggest positional change after sitting 2hours for 15-30min.

*Id.* He also opined that Christopher should "avoid even moderate exposure" to hazards "due to ongoing opioid pain mgmt." R. 87. As most relevant here, Dr. Camden explained that his proposed RFC finding as a whole was based on evidence showing:

> [Christopher] had the spinal cord stimulator replaced in 2021 and follow up with surgeon 06/21 reported device working properly and providing benefit. The exam at this visit additionally noted normal ROM for neck, normal motor throughout, SILT, bilateral Hoffmans, and normal steady gait . . . . Description of XR would appear consistent with overall record and file evidence does not suggest need for an updated study, as this has not been requested by his treating pain specialist. . . . *With the additional records from claimant's pain specialist, there appears to be sufficient evidence to lower functional expectations, as there is indication of residual right leg neural damage from past severe lumbar DD, with sensory loss to right S1 dermatome and sitting SLR +RLE.* Claimant does remain able to ambulate without assistive device and is able to manage periods of standing and walking throughout the day. The spinal impairment is not at listing level but appears to erode his ability to manage standing and walking in a normal 8hour workday.

R. 87–88 (emphasis added). He recommended that Dr. Humphries's "light RFC" finding, R. 77, be "adjust[ed] to 4 hours stand/walk, with accommodations for positional changes from standing to sitting, and otherwise [remain] unchanged," R. 88; *see* R. 86 ("Subject: eroded light" RFC).

*

In December 2023, Christopher appeared with counsel and testified at a hearing before ALJ Peter Koclanes. R. 50–59. He explained that he worked as a collections agent for Capital One from November 2000 until June 2021. *See* R. 50. He went into the office for ten hours a day on Mondays, Tuesdays, Thursdays, and Fridays. R. 251. This modified 40-hour schedule meant he "never had to be at work more than two days without a day off." *Id.* Christopher stopped working because "sitting and standing were becoming a really major issue." R. 51. Before this, Capital One gave him an ergonomic chair, R. 241, and an electronic sitting-standing desk so he could "stand up for a few minutes" and "sit down for a little while" as needed, R. 51. *See* R. 59, 251. He switched positions "every 15–20 mins." R. 251. During the last "10 years or so" of his career, Christopher "was able to do that each day to compensate" for pain from sitting and standing. R. 51. By June 2021, however, both the pain and the side effects from pain medications were "too much." *See id.* Christopher "was having a hard time just completing the task hand" even with the flexible sit-stand option. *Id.*; *see* R. 59. Capital One "eliminated [his] job because [he] was no longer able to perform [his] duties," such as making "a certain number of [calls] per hour." R. 51. Christopher took Hydrocodone and Flexeril "three times a day" to help manage his pain and muscle spasms. R. 54. He described significant problems sitting and standing secondary to post-surgical lumbar pain, nerve damage, and sensory loss. *See* R. 55–56.

A vocational expert ("VE") also testified at this hearing. R. 59–66. She testified that Christopher had past relevant work as a collection clerk (DOT No. 241.357-010), which is a

skilled, sedentary[4] occupation "as generally performed and actually performed" by Christopher. R. 60, see R. 251. ALJ Koclanes asked the VE about the occupational prospects for a hypothetical person with Christopher's vocational profile if this person "can perform work at the light exertional level as defined [in] the regulations, with lifting or carrying up to 20 pounds occasionally and 10 pounds frequently, standing or walking . . . up to six hours and sitting up to six hours in an eight-hour workday," but must also (as relevant here) "avoid even moderate exposure to hazards, including moving mechanical parts or unprotected heights."[5] See R. 60–61. The VE responded that this person could still do Christopher's past job as a collection clerk, or he could perform certain unskilled "light" occupations (merchandise marker, sales attendant, cafeteria attendant) available in the national economy. See R. 60–63. She also testified that "an employe[r] will tolerate up to 10 percent [time] off task" during an eight-hour workday. R. 63. No one asked the VE if any jobs were available to this person if his or her RFC reflected Dr. Camden's proposed four-hour standing/walking restriction, sit-stand option, or both. See R. 60–64, 86–87.

\*\*

ALJ Koclanes issued an unfavorable decision on February 2, 2024. R. 30–40. He found

---

[4] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying [objects] like docket files, ledgers, and small tools." 20 C.F.R. §§ 404.1567(a), 416.967(a). It requires the ability to sit for about six hours during an eight-hour workday and to stand and/or walk for the remaining two hours. *Neal v. Astrue*, Civ. No. 09-2316, 2010 WL 1759582, at \*3 (D. Md. Apr. 29, 2010); SSR 83-10, 1983 WL 31251, at \*5.

[5] This hypothetical RFC is a hybrid of Dr. Humphries's and Dr. Camden's conflicting medical opinions about Christopher's maximum remaining capacities to sit, stand, walk, and work around hazards. *See* R. 77–78, 86–87. It reflects Dr. Camden's opinion that Christopher should avoid *even moderate exposure* to workplace hazards, but not his opinions that Christopher could stand/walk for four hours total and sit for about six hours during an eight-hour workday *if* he "periodically alternate[s] sitting and standing" throughout the day. Conversely, it reflects Dr. Humphries's opinion that Christopher could sit and stand/walk for about six hours each during an eight-hour workday, but not his opinions that Christopher need only avoid *concentrated* exposure to workplace hazards.

7

that Christopher had the following severe medically determinable impairments ("MDIs"): "lumbar spondylosis, stenosis, and radiculopathy; cervical degenerative disc disease; post laminectomy syndrome; and coronary artery disease." R. 32. Those impairments did not meet or medically equal the relevant Listings. R. 32–33 (citing 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 1.15, 4.04; R. 242–49, 332, 339, 400–02, 408, 411, 428, 432, 434, 436, 438, 442, 445).

Turning to Christopher's RFC, ALJ Koclanes found that he could perform light work as defined in the regulations with:

> [L]ifting and/or carrying up to 20 pounds occasionally and 10 pounds frequently; standing and/or walking up to 6 hours and sitting up to 6 hours in an 8-hour workday; never climb ladders, ropes, and scaffolds; occasionally stoop; frequently climb ramps/stairs, frequently balance . . . , kneel, crouch, and crawl; avoid concentrated exposure to vibration; avoid even moderate exposure to hazards including moving mechanical parts or unprotected heights; and no production rate work, including assembly line work and work involving hourly quotas.

R. 34.[6] ALK Koclanes considered Dr. Humphries's and Dr. Camden's medical opinions as part of the RFC assessment. *See* R. 37–38. He noted that Dr. Humphries initially opined Christopher "could perform a range for light exertional tasks" except he had some postural limitations and should "avoid[] concentrated exposure to vibration and hazards." R. 37 (citing R. 77–78). He

---

[6] No one asked the VE whether work was available if the hypothetical person's RFC further restricted him or her to "no production rate work," R. 34, 37, "including assembly line work and work involving hourly quotas," R. 34. R. 60–64; *see Walker v. Bowen*, 889 F.2d 47, 50–51 (4th Cir. 1989). Christopher testified that his past job as a collection clerk actually required him to make "a certain number of [calls] per hour," and that Capital One eliminated the position because he "was no longer able to perform [his] duties." R. 51. The VE was not asked if collection clerks generally do production rate work, R. 60–64, and ALJ Koclanes did not cite any other evidence to support his conclusion that the above RFC allowed Christopher to do this work as "it was actually and generally performed," R. 38. *See Goodman v. Astrue*, 539 F. Supp. 2d 849, 851–53 (W.D. Va. 2008). Nor is there any information in the record about the number of merchandise marker, sales attendant, or cafeteria attendant jobs in the national economy, R. 39 (citing R. 60–61), that do not involve "production rate work, including . . . hourly quotas," R. 34. *Cf. Pearson v. Colvin*, 810 F.3d 204, 211 (4th Cir. 2015). Thus, even if this Court could affirm ALJ Koclanes's exertional RFC finding, it still could not say that substantial evidence supports the denial of benefits at step four or step five. *See, e.g., Pearson*, 810 F.3d at 211 (step five); *Goodman*, 539 F. Supp. 2d at 853 (step four). The Commissioner should remedy both legal errors on remand. *See Woody v. Barnhart*, 326 F. Supp. 2d 744, 751, 754 (W.D. Va. 2004).

noted Dr. Camden later opined that Christopher was "limited to standing and walking 4 hours in an 8-hour workday and would need to avoid even moderate exposure to hazards, but otherwise retained [Dr. Humphries's] initial level findings." R. 37 (citing R. 86–88). He did not mention Dr. Camden's comment that the initial RFC determination should include "accommodations for positional changes from standing to sitting, and otherwise [remain] unchanged." R. 88; see R. 86.

ALJ Koclanes found Dr. Humphries's initial "opinion generally persuasive" and Dr. Camden's later opinion "less persuasive." R. 38. His entire explanation for how he reached this conclusion states, "[w]hile the claimant occasionally exhibited antalgic gait or positive straight leg raise test, he endorsed improvement with his pain management treatment and he often exhibited largely full strength, range of motion, and sensation, more consistent with the exertional and postural limitations identified at the initial level." R. 38 (citing R. 332, 339, 400–02, 408, 411, 428, 432, 434, 436, 438, 442, 445). Most of the cited medical records contain no information about Christopher's strength, range of motion, or sensation. R. 332–34, 432–33, 434–35, 436–37, 438, 442. The rest document normal gait, strength, range of motion, and sensation on two occasions, R. 339 (June 2021), 445 (Nov. 2023), but positive straight-leg tests, limited lumbar range of motion, spinal tenderness, reduced lower-extremity sensation, and/or abnormal gait on four occasions, R. 400–02, 407–08, 410–11 (Apr., July & Sept. 2022), 427–28 (June 2023).

At step four, ALJ Koclanes found that the above RFC finding, R. 34, allowed Christopher to return to his past work as a collection clerk. R. 38–40 (citing R. 60–61). Alternatively, relying on the VE's testimony at step five, he found that based on Christopher's RFC, age categories, education, and work history, certain light occupations existed in the national economy that he could perform, like merchandise marker, sales attendant, and cafeteria attendant. R. 39 (citing R.

9

60–61). Accordingly, ALJ Koclanes concluded that Christopher was not disabled from June 30, 2021, through February 2, 2024. R. 38–40. The Appeals Council declined to review that decision, R. 13–18, and this appeal followed.

### III. Discussion

Christopher challenges ALJ Koclanes's evaluation of conflicting DDS medical opinions in concluding that Christopher could sit for up to six hours (without a sit-stand option), and stand/walk for up to six hours, during an eight-hour workday. *See generally* Pl.'s Br. 12–18. As noted, on initial review, Dr. Humphries opined that Christopher could sit and stand/walk for about six hours each in an eight-hour workday. R. 77. When Dr. Camden reviewed Christopher's updated records on reconsideration, he reduced Christopher's functioning to a total of four hours standing/walking and added an "accommodation for positional changes from standing to sitting." R. 88; *see also* R. 86–87. ALJ Koclanes found Dr. Humphries's opinion more persuasive and concluded that Christopher could sit and stand/walk for about six hours each during an eight-hour workday. R. 34. He did not mention Dr. Camden's proposed sit-stand limitation. *See* R. 37–38. Christopher argues that ALJ Koclanes "did not properly evaluate [the] supportability or consistency" factors when assessing the persuasiveness of Dr. Humphries's and Dr. Camden's opinions. *See* Pl.'s Br. 13–18 (citing 20 C.F.R. § 404.1520c). I agree.

\*

A claimant's RFC is his or her "maximum remaining ability to do sustained work activities in an ordinary work setting" for eight hours a day, five days a week despite his or her MDIs and related symptoms. SSR 96-8p, 1996 WL 374184, at *2 (emphasis omitted). It is a factual finding "made by the [ALJ] based on all the relevant evidence in the case record," *Felton-Miller v. Astrue*, 459 F. App'x 226, 230–31 (4th Cir. 2011), including objective medical

10

evidence, medical opinions, and the claimant's symptoms, 20 C.F.R. § 404.1545(a), (e). The ALJ's RFC finding should reflect all credibly established "restrictions caused by medical impairments and their related symptoms" that impact the claimant's "capacity to do work-related physical and mental activities" on a regular and continuing basis. SSR 96-8p, 1996 WL 374184, at *1–2; *see Shinaberry v. Saul*, 952 F.3d 113, 123 (4th Cir. 2020); *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015). The ALJ has broad (but not unbounded) discretion to determine if an alleged restriction on a specific functional capacity is supported by and consistent with evidence in the claimant's record. *See Hines*, 453 F.3d at 564–66; *Perry v. Colvin*, 2:15-cv-1145, 2016 WL 1183155, at *5 (S.D. W. Va. Mar. 28, 2016) (citing *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)).

Medical opinions play an important role in a proper RFC assessment. 20 C.F.R. § 404.1545(a)(3); *see, e.g.*, *Oakes v. Kijakazi*, 70 F.4th 207, 212–15 (4th Cir. 2023). "Medical opinions" are "statement[s] from a medical source about what [the claimant] can still do despite" his or her MDIs and whether he or she has any "impairment related limitations or restrictions" in meeting specific functional demands of work. 20 C.F.R. § 404.1513(a)(2). For DIB claims filed on or after March 27, 2017, ALJs "will articulate" in their decisions "how persuasive [they] find all of the medical opinions . . . in [the] case record" to be. *Id.* § 404.1520c(b). When evaluating persuasiveness, ALJs "will consider [all] medical opinions . . . using the [following] factors:" (1) supportability; (2) consistency; (3) a physician's relationship with the claimant; (4) a physician's specialization; and (5) other factors, like the physician's familiarity with the evidentiary record. *See Oakes*, 70 F.4th at 212 (citing 20 C.F.R. § 404.1520c(b)(1)–(5)). The first two factors—supportability and consistency—"are the most important factors [ALJs] consider when [they] determine how persuasive [they] find a source's medical opinions . . . to be. Therefore, [ALJs]

11

*will explain* how [they] considered the supportability and consistency factors for [each] medical source's medical opinions." 20 C.F.R. § 404.1520c(b)(2) (emphasis added). They "may, but are not required to, explain how [they] considered the [other] factors" in determining how persuasive the source's medical opinions are to the disability determination. *Id.*; *see Drumgold v. Comm'r of Soc. Sec.*, 144 F.4th 596, 604–06 (4th Cir. 2025) (discussing 20 C.F.R. § 404.1520c(b)).

"Supportability is the degree to which a [source] supports their opinion with relevant, objective medical evidence and explanation." *Oakes*, 70 F.4th at 212 (citing 20 C.F.R. § 404.1520c(c)(1)). "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . the more persuasive the medical opinions . . . will be" in the ALJ's disability determination. 20 C.F.R. § 404.1520c(c)(1). "This makes sense: In disability claims, as in life, opinions are more persuasive when evidence backs them up." *Drumgold*, 144 F.4th at 606. "[C]onsistency is the degree to which a provider's opinion is consistent with the evidence of other medical and non-medical sources in the record." *Oakes*, 70 F.4th at 212 (citing 20 C.F.R. § 404.1520c(c)(2)). *Id.* "The more consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the claim [record], the more persuasive the medical opinion(s) . . . will be" in the ALJ's disability determination. 20 C.F.R. § 404.1520c(c)(2). "Like supportability, consistency also makes sense: If a host of sources say one thing, but a single source says something different, then one should question the relatability of the contradictory source." *Drumgold*, 144 F.4th at 607.

ALJs are responsible for determining how persuasive conflicting medical opinions are based on all the relevant evidence in the claimant's record. *See id.* at 605–06. When the ALJ conducts this analysis in a manner consistent with the regulation, a court will not second-guess

12

that "decision unless it is exceptionally clear that the ALJ made a mistake." *Id.* at 605. Nonetheless, the ALJ's decision must also "offer[] a sufficient rationale in crediting certain evidence and discrediting other evidence." *Id.* at 605 (quoting *Shelley C. v. Comm'r of Soc. Sec. Admin.*, 61 F.4th 341, 353 (4th Cir. 2023)). "Missing analysis 'makes it impossible for a reviewing court to evaluate whether substantial evidence supports the ALJ's findings.'" *Id.* (quoting *Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013)). The Fourth Circuit therefore requires that ALJs "must not only reach a conclusion supported by substantial evidence[,] but also build an accurate and logical bridge" from the evidence they cited to their conclusion as to how persuasive they find a medical opinion to be after "applying the correct factors." *See id.* (quotation marks omitted).

\*\*

ALJ Koclanes's decision does not satisfy this deferential standard of review. First, he did not address supportability at all. He concluded that Dr. Humphries's initial opinion was "generally persuasive," but Dr. Camden's "reconsideration level findings [were] less persuasive." R. 38. His one-sentence explanation merely noted that, while Christopher "occasionally exhibited an antalgic gait or positive straight leg raise test, he endorsed improvement with his pain management treatment and he often exhibited largely full strength, range of motion, and sensation [which is] more consistent" with Dr. Humphries's initial determination. R. 38 (citing R. 332, 339, 400–02, 408, 411, 428, 432, 434, 436, 438, 442, 445). Missing from this explanation is any discussion of the supportability of these conflicting opinions. *See Jeremy C. v. Kijakazi*, No. 7:22-cv-29, 2023 WL 2474217, at \*6 (W.D. Va. Mar. 13, 2023) (reversing and remanding where ALJ made the same error). The regulation requires him both to "consider" supportability for each opinion *and* to "explain how [he] considered" that

13

factor in determining how persuasive he found them to be. 20 C.F.R. § 404.1520c(b)(2). The ALJ's explanation does not discuss what evidence, if any, the sources used to support their conflicting opinions. Thus, I "can only speculate as to how" the ALJ considered the DDS opinions "under the application regulation[], or whether he even properly considered them at all." *Jeremy C.*, 2023 WL 2474217, at *6.

Second, ALJ Koclanes did not adequately address the consistency factor. Although he used the phrase "more consistent," R. 38, his threadbare discussion of how he considered this factor was inadequate. *See, e.g.*, *Stephen R. v. O'Malley*, No. 21-2292, 2024 WL 3508155, at *4–5 (4th Cir. July 23, 2024). As stated above, the ALJ found Dr. Humphries's initial opinion "more consistent" with the record because Christopher "endorsed improvement with his pain management treatment and he often exhibited largely full strength, range of motion, and sensation." R. 38 (citing R. 332, 339, 400–02, 408, 411, 428, 432, 434, 436, 438, 442, 445). From this conclusion, he adopted Dr. Humphries's opinion that Christopher could sit and stand/walk for about six hours each in an eight-hour workday. R. 34, 38. The ALJ merely summarized a select few pieces of evidence and concluded that they were more consistent with Dr. Humphries's less restrictive RFC. He did not explain *how* the cited evidence was inconsistent with Dr. Camden's more restrictive opinion that Christopher could only stand/walk for four hours in an eight-hour workday and needed a sit-stand option. *Paul B. v. Kijakazi*, No., 6:20-cv-78, 2022 WL 989242, at *4 (W.D. Va. Mar. 31, 2022) (noting that the ALJ must analyze "consistency . . . by evaluating the relevant medical evidence, including countervailing evidence; and by connecting that evidence to his ultimate conclusion"). Moreover, the evidence cited by the ALJ to support his less restrictive RFC, R. 38 (discussing records from pain specialist and positive straight leg raise test), is the same evidence cited by Dr. Camden to support a more

14

restrictive RFC, R. 87–88 (discussing same). *Cf. Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 108 (4th Cir. 2020) ("An ALJ may not substitute his own lay opinion for a medical expert's when evaluating the significant of clinical findings."). Absent an adequate explanation, I cannot meaningfully review the ALJ's rationale for denying benefits.

ALJ Koclanes also implicitly rejected Dr. Camden's proposed sit-stand option by failing to include it in the RFC finding. *Kirk v. Kijakazi*, No. 5:20-cv-51, 2022 WL 3440643, at *5 (W.D.N.C. Aug. 16, 2022) ("the ALJ implicitly rejected the portion of [the provider]'s opinion that limited the Plaintiff to 'simple two step commands' by declining to include that limitation in the RFC."); *Sandra W. v. Kijakazi*, No. 7:20-cv-683, 2022 WL 545075, at *5 (W.D. Va. Feb. 23, 2022) (noting that the ALJ "implicitly rejected some of the [state agency physician's] non-exertional limitations" by failing to incorporate them in the RFC). Despite Dr. Camden thoroughly explaining the medical evidence that supported Christopher's need for a sit-stand option, R. 86–88, the ALJ did not mention it at all, *see* R. 34–38. An ALJ has a duty to not only acknowledge conflicts in the evidence, but explain how he resolved them. *Cf. Woodhouse ex rel. Taylor v. Astrue*, 696 F. Supp. 2d 521, 533 (D. Md. 2010) (an ALJ must do more than point out conflicts in the evidence; he must explain how he considered and resolved them in reaching his conclusions). The ALJ did not explain how he resolved the conflict between Dr. Camden's medical opinion that included a sit-stand option and his own RFC finding, based on Dr. Humphries's countervailing opinion, that made no mention of a sit-stand option. The ALJ's errors in analyzing the medical opinions require remand.

## IV. Conclusion

I take no position as to whether Christopher is entitled to disability benefits. On remand, the ALJ must consider and apply the applicable legal rules to all the relevant evidence in the

record; explain how any material inconsistencies or ambiguities were resolved at each critical stage of the determination; and, assuming that Christopher cannot prove he was disabled based on the medical evidence alone, provide a logical link between the evidence that ALJ found credible and the RFC determination.

For the foregoing reason, I respectfully recommend that the presiding District Judge **GRANT** the Plaintiff's motion for judgment on the pleadings, ECF No. 11, **REVERSE** the Commissioner's final decision, **REMAND** the matter under the fourth sentence of 42 U.S.C. § 405(g), and **DISMISS** the case from the Court's active docket.

### Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the presiding United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to counsel of record.

ENTER: August 26, 2025

Joel C. Hoppe
United States Magistrate Judge